CITY OF FORT SMITH v. BONNER.

4-4719

Opinion delivered July 12, 1937.

*Fadjo Cravens* and *Jos. R. Brown,* for appellant.

*Hardin & Barton* and *Daily & Woods,* for appellees.

GRIFFIN SMITH, C. J. This appeal is from the action of the chancery court in denying the prayer of a petition by appellant, City of Fort Smith, that the defendant-appellee be enjoined from maintaining, in an addition to the city, a business designated "horse, mule and live stock barns and enclosures."

It is alleged that the defendant "accumulated in these barns and enclosures large numbers of stock, creating offensive and nauseating odors that taint the atmosphere for many blocks; that said stock attracts large swarms of flies and other insects that harass the neighborhood; that said animals annoy residents by braying and making other disturbing noises day and night; that auctions held at short regular intervals attract large numbers of buyers, who congregate at the barns, blocking streets with their parked trucks and other vehicles, and that the conduct of said auctions is loud and disturbing and lasts throughout the day and much of the night."

The answer was a denial of the essential parts of the complaint, coupled with an allegation that appellee acquired the property and had operated the business for eleven years; that he had spent large sums of money making improvements; that appellant had issued a permit, authorizing the business to be conducted, and was estopped to maintain the action.

The appellee, First National Bank, intervened, alleging that it had a mortgage on the property, and was therefore interested in the suit.

Appellees' brief contains the following statement of facts: "There is a suburban railroad which circles the city of Fort Smith, built many years ago for the express purpose of encouraging the building of industrial enterprises around the city and along this railroad. Many years ago a lumber yard was built on this suburban railroad at the site now occupied by the Bonner Yards and Barn. This enterprise was discontinued and the buildings remained unused for a number of years. Some twelve years ago, Joe Bonner bought the property, and procured a permit from the city to establish and maintain the same as a Live Stock Commission Barn. He was permitted by the city to build a side track from the main railroad line to the gates of his barn as a convenience and facility.

"He operated this barn unmolested, improving and enlarging the same from time to time until 1936, when this suit was started. As late as May 1, 1936, he was granted permission from the city to change and remodel his barns and to install scales for the weighing of the live stock. At that time he expended several hundred dollars on these improvements. Two or three years ago he made improvements amounting to about $3,500.

"When he took over the place and established his business there, there were but few residences to the east of him, but in the rush times of the late twenties, and up to about 1931 and 1932, a great many houses were built to the east of him. All of the complaining witnesses, except possibly one or two, moved into the community during the time this barn was in operation and flourishing. These complaining residents live to the east and southeast for the most part. Grand Avenue runs east and west and to the immediate south of these barns, that is, the barns are located approximately one block north of Grand, there being no buildings, except a few little business houses, between it and Grand. Immediately west of the barns is a creek or branch along the banks of which the suburban railroad runs. There are no buildings near the suburban and east of it for many blocks south-

ward, and none for several blocks northward except some negro shacks. On Grand Avenue west, there are some residences and some little business houses. Immediately in front of this barn there is a whole block vacant except for a house on the southeast corner of the block. To the east and southeast along Grand Avenue, several blocks from the Bonner barns, are the comparatively new additions of Clifton Court, East End Place, and Hawthorne Place."

Appellant's summary c o n t a i n s the following declaration:

"The barn is located in a developed residential section as shown by the record, and defendant Bonner, just before the suit was brought, told newspaper representatives he was building eighty new stock pens under cover, and would sell cattle and hogs during the summer season. He also informed the paper he was installing five new chutes and expected commission firm buyers from Joplin, Springfield and Kansas City. He contemplated 'big sales' of hogs, cattle, horses, mules, etc. He intended to get as much stock as he could to sell at his barn.

"All witnesses, including defendant Bonner, testified that in operating the business, several hundred head of stock were collected in the barn and adjacent pens."

R. B. Odom, a witness for appellant, testified that his home was about a block from the Bonner barn; that the barn is "a big old dilapidated, ramshackle building, a block long and half a block wide, with adjoining pens. In the pens are kept hogs, cows, horses and mules. East of the barn are homes, extending thirteen blocks to the county farm, and homes are north of the barn, extending about eight or ten blocks. There are several hundred homes in the neighborhood surrounding the barn. The barn is an eye-sore and odors emanating from it are very offensive, especially in summer. After a rain it is almost unbearable. The barn is a breeding place for rats, mice, flies and insects of all kinds that infest the homes. Jackasses bray, horses neigh, cows low, and much noise results from unloading stock at night. Several hundred

head of stock are concentrated at the barn during auctions. Stock is brought in every day to prepare for auction and horses and mules get out and run across yards. The barn has a dirt floor, covered with manure. Odors can be detected five or six blocks away in every direction; flies breeding in the barn are noticeable in unusual numbers the same distance. I cannot use my sleeping porch because of barn odors."

Sixteen other witnesses for appellant testified, and the testimony of others was offered under an agreement that it would be treated as given, and as conforming to that already heard. On rebuttal appellant offered other witnesses.

Defendant-appellee Bonner's denial or contradiction of testimony given by appellant's witnesses was sustained by twenty-four witnesses, who testified that they lived in the immediate neighborhood of the barn; that it was maintained in an orderly and sanitary manner; that the odors complained of by appellant's witnesses came from the sewer, and not from the barn; that the barn had the usual stable odors, but that such odors were not noticeable at any great distance from the premises, etc.

Dr. Stubbs, president of the Fort Smith District Board of Health, testified that, in his opinion, too much manure was allowed to accumulate at the barn; that it was a breeding place for flies; that it would be impossible to keep the barn sanitary; that offensive odors were bound to come from the place in summer; that flies from the barn were found in unusual numbers in the neighborhood, carrying bacteria that caused infection and disease, and that rats and mice bred in places like defendant's barn.

Witnesses for appellees testified to the contrary.

Appellant, in its reply brief, concedes that "defendant's horse, mule and stock business is not a nuisance *per se.*" It is contended, however, that the evidence shows it is a nuisance, operated as it is in the present location, and appellant relies largely upon *Fort Smith* v. *Western Hide & Fur Company,* 153 Ark. 99, 239 S. W. 724, as authority for a reversal.

In that case the appellee was engaged in the business of buying and selling hides and furs, such business being operated in appellee's own building situated near the center of the business district of Fort Smith. The business had been operated for ten years. In an opinion written by Chief Justice McCulloch, this court said: "A careful consideration of the testimony leaves no escape from the conclusion that the place of business maintained by appellee was offensive to those who came into the neighborhood. There were bad odors which were easily detected, and which were sufficient to constantly annoy those who were engaged in business in the locality or who came there for any purpose. * * * The case affords, perhaps, an example where a business established at a place remote from population is gradually surrounded and becomes part of a populous center, so that a business which formerly was not an interference with the rights of others has become so by the encroachment of the population. Under these circumstances, private rights must yield to the public good, and a court of equity will afford relief, even where a thing originally harmless under certain circumstances, has become a nuisance under changed conditions. Appellee pleads a license from the city in bar of the right to abate the nuisance, but the fact that the city granted a license to operate a hide and fur business does not imply that it could be operated in a manner so as to constitute a public nuisance, or to bar the city from suppressing the nuisance. *Durfey* v. *Thalheimer*, 85 Ark. 544, 109 S. W. 519; *Wilder* v. *Little Rock*, 150 Ark. 439, 234 S. W. 479."

In *Durfey* v. *Thalheimer*, referred to *supra*, the court said: "It is the duty of everyone to so use his property as not to injure that of another; and it matters not how well constructed or conducted a livery stable may be, it is nevertheless a nuisance if it is so built or used as to destroy the comfort of persons owning and occupying adjoining premises, creating an annoyance which renders life uncomfortable; and it may be abated as a nuisance."

In *Clay County Ice Co.* v. *Littlefield,* 187 Ark. 911, 63 S. W. (2d) 530, it was held that operation of an ice plant in a residential district was an abatable nuisance where it materially injured property and annoyed residents, regardless of how well the plant was constructed and conducted.

These general principles are not denied by appellees. It is insisted, however, as shown by the record, that the testimony is in sharp conflict, and that a question of fact was presented for the chancellor's determination. It is further insisted that in dismissing the complaint, the court necessarily found that the weight of evidence was in favor of appellees.

If this had been a suit for damages, brought by affected parties, it is possible that special injuries might have been shown, but where half of the people residing in a district testify that certain conditions are objectionable, and the other half testify that the same conditions are not objectionable, this court will not hold that a chancellor was in error when he found that the thing complained of and its incidental operations did not constitute an abatable nuisance.

In *Jackson* v. *Columbia County,* 116 Ark. 386, 172 S. W. 1035, we said: "The burden of proving that the keeping of the stable deprived appellant of the comforts of home or rendered life in her home uncomfortable, rested upon her, and it was necessary to show it by a preponderance of the testimony. There was testimony introduced, supporting the allegations and contentions, but the majority of the court is of the opinion that the finding of the chancellor is not against the clear preponderance of the testimony."

In *Terrell* v. *Wright,* 87 Ark. 213, 112 S. W. 211, 19 L. R. A. (N. S.) 174, it was said: "According to our settled notions and habits, there are convenient places— one for the home, one for the factory; but, as often happens, the two must be so near each other as to cause some inconvenience. The law cannot take notice of such inconvenience, if slight or reasonable, all things considered, but applies the common-sense doctrine that the parties

must give and take, live and let live; for here extreme rights are not enforceable rights—at any rate, not by injunction.

"This defines the situation here. That this planing mill is highly objectionable to plaintiffs and their families is unquestionably true. But that its operation is of such a nature as to deprive a normal person, living where plaintiffs live, of the comforts of home, or render living in such homes a positive discomfort, is not established by a preponderance of the testimony, and this is required before a lawful and useful business can be destroyed by a perpetual injunction."

The record in the instant case shows that inconvenience, annoyance, and objectionable conditions attend operation of appellee's stable, but we are not willing to say, in view of all the testimony, that the chancellor's findings are contrary to the weight of evidence, which he resolved in favor of appellees.

Affirmed.